## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CERIBELL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. _____ |
| | ) | |
| NATUS MEDICAL INCORPORATED, | ) | **JURY TRIAL DEMANDED** |
| EXCEL-TECH LTD., and | ) | |
| NATUS NEUROLOGY | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Ceribell, Inc. ("Ceribell") brings this action for patent infringement of U.S. Patent Nos. 9,820,670 ("the '0670 patent), 12,150,769 ("the '769 patent), 12,324,670 ("the '4670 patent), 12,336,826 ("the '826 patent), 10,433,756 ("the '756 patent), and 11,357,434 ("the '434 patent) (collectively, the "Asserted Patents") against Defendants Natus Medical Incorporated, Excel-Tech Ltd., and Natus Neurology Incorporated (collectively, "Natus" or "Defendants") and allege as follows:

## INTRODUCTION

1.       Plaintiff Ceribell is the pioneering innovator and market leader in the field of rapid point-of-care electroencephalogram ("EEG") monitoring products for clinical use in acute care settings.  After years of groundbreaking research and development, Ceribell revolutionized seizure detection with its patented point-of-care EEG system (the "Ceribell System").  It transformed a clinical challenge that took 1 to 4 hours or more into a life-saving breakthrough[1] that takes only 5

_____

[1]   Paul M. Vespa, et al., *Evaluating the Clinical Impact of Rapid Response Electroencephalography: The DECIDE Multicenter Prospective Observational Clinical Study*, CRITICAL CARE MED., Sept. 2020.

to 10 minutes to set up and is now implemented across 550+ hospitals in the United States.[2] Ceribell's innovations further gave rise to the Asserted Patents, which Ceribell raises in this action to put a stop to Defendants' unlawful infringement.

2.    Defendants are serial copycats with a documented history of willful patent infringement.  Rather than innovate, Natus systematically steals.  In 2018, a federal jury found Natus willfully infringed another company's patents on neurological sleep diagnostic technology, leading to a permanent injunction and damages.[3]  Now, Natus has struck again—this time targeting Ceribell's revolutionary technology with a blatant knockoff product that copies critical innovations that Ceribell spent years developing and patenting.  Ceribell's technology was born out of a clinical need that remained unfulfilled by Natus' "conventional" EEG technology for decades.  Indeed, Ceribell's technology and very existence are a direct reflection of Natus' inability or failure to innovate.

3.    Ceribell was founded in 2014 to provide neurological care in medical settings such as Intensive Care Units (ICUs) and Emergency Departments (EDs) where conventional EEG approaches, such as Natus' legacy EEG products, had proven too slow and impractical.  EEG monitoring products measure the brain's electrical activity using electrodes placed on a patient's scalp to detect and monitor neurological conditions, most notably seizures and "status epilepticus." Status epilepticus refers to prolonged or repeated seizures without recovery in between, which is a serious neurological emergency that requires urgent recognition and medical intervention.  If

---

[2]   Ceribell Q1 2025 10-Q filing, available at https://investors.ceribell.com/static-files/a5d66d4f-e42b-48df-83db-da99cd68a398; *see also* BioTech Health X, *CeriBell (CBLL) is a Smart MedTech Play in 2025*, BIOTECH HEALTH X (May 30, 2025), https://biotechhealthx.com/biotech-news/ceribell-cbll-is-a-smart-medtech-play-in-2025/.

[3]   Permanent Injunction, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. June 5, 2018), D.I. 285; Final Judgment, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. Sept. 11, 2018), D.I. 335.

status epilepticus is not recognized and treated quickly, it can lead to mortality or severe and permanent brain damage. Prompt detection and management of seizures and status epilepticus are crucial for improving patient outcomes. Ceribell's mission—to make EEG monitoring as fast and routine as checking vital signs—led to the development of a first-of-its-kind rapid, point-of-care EEG system, the Ceribell System, which was launched commercially in 2018. The Ceribell System is cleared by the U.S. Food and Drug Administration ("FDA") for indicating suspected seizure activity. It is currently utilized in over 550 hospitals in the United States, and has aided in improving neurological care and outcomes for more than 200,000 patients.[4] With the Ceribell System, Ceribell has transformed a once-niche neurodiagnostic tool into a major advance in frontline intervention, helping to manage and improve patients' care in hospitals nationwide.[5]

4. The Ceribell System, shown below, comprises an EEG recording and amplifying device that is used with a single-use electrode headband, configured with 10 integrated electrodes and a novel system for dispensing conductive gel to the measurement sites on a patient. The EEG recording and amplifying device connects to the hospital's WiFi network and streams EEG data to Ceribell's web-based EEG portal software, which neurologists can log into and remotely read and interpret the EEG. With these components working together, the Ceribell System provides a seamless, easy-to-use, clinical grade EEG monitoring system to support detection and diagnosis of seizures and other neurological conditions.

---

[4] Ceribell Q1 2025 10-Q filing, available at https://investors.ceribell.com/static-files/a5d66d4f-e42b-48df-83db-da99cd68a398.

[5] *Id.*



**Fig. 1. The Ceribell System, Including Wearable Headband and EEG Recorder**

5.      Ceribell's efforts to innovate and improve patient outcomes in neurological care have not stopped with the launch of the ground-breaking Ceribell System.  Since the System's introduction, Ceribell has devoted significant resources to advancing EEG technology and bringing additional wearable EEG devices to market.[6]  As just one example, Ceribell began incorporating artificial intelligence ("AI") into its product development in 2019—a time when AI was closer to science fiction than the widely implemented technology it is today.  Ceribell has acted diligently to protect its research by applying for and successfully receiving numerous patents to protect its ongoing innovation efforts.[7]

6.      In bringing its new technology to market, Ceribell has gone to great lengths to earn the trust of the medical community.  Ceribell has demonstrated—to the satisfaction of a great number of neurologists, emergency physicians, and other critical care practitioners—that its technology reliably offers healthcare providers timely and vital EEG information to support rapid clinical decision-making in acute care settings.  To this end, Ceribell invested in clinical studies

---

[6]  *Id.*

[7]  Ceribell 2024 S-1 filing, available at https://investors.ceribell.com/node/6591/html.

with renowned medical institutions, including the SAFER-EEG Trial,[8] the DECIDE trial,[9] and the AccuRASE Study,[10] to show the clinical significance and scientific rigor of the Ceribell System. Ceribell continues to invest today in further research and study, as well as in further improvements to its technology and products.

7.    Ceribell has earned widespread industry recognition for its role in transforming healthcare, beginning with the technological innovations of its Ceribell System, detailed further below.  For example, in 2023, Fast Company recognized Ceribell as one of the top 10 most innovative medical device companies.[11]  Additionally, the FDA has granted Ceribell two separate Breakthrough Device Designations[12] for its innovative technologies and their transformative nature.  This designation is reserved for cutting-edge devices that "provide[] for more effective treatment or diagnosis of life-threatening or irreversibly debilitating human disease or conditions" and are worthy of special consideration by FDA in the regulatory authorization process.[13]  Only

---

[8]   Mariel Kalkach-Aparicio et al., *Seizure Assessment and Forecasting With Efficient Rapid EEG ("SAFER-EEG")*, NEUROLOGY, July 2024.

[9]   Paul M. Vespa et al., *Evaluating the Clinical Impact of Rapid Response Electroencephalography: The DECIDE Multicenter Prospective Observational Clinical Study*, CRITICAL CARE MED., Sept. 2020.

[10]   Zubeda B. Sheikh et al., *Accuracy of a Rapid Response EEG's Automated Seizure-Burden Estimator*, NEUROLOGY, Jan. 2025.

[11]   Ceribell, Inc., *Ceribell Named to Fast Company's 2023 List of the World's Most Innovative Companies*, PR NEWSWIRE (Mar. 2, 2023), https://www.prnewswire.com/news-releases/ceribell-named-to-fast-companys-2023-list-of-the-worlds-most-innovative-companies-301760414.html.

[12]   *See, e.g., Breakthrough Devices Program*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medical-devices/how-study-and-market-your-device/breakthrough-devices-program#authorizations (last visited June 27, 2025) (identifying Ceribell ESE device, which received FDA 510(k) clearance: K223504).

[13]   *See* U.S. FOOD & DRUG ADMIN., BREAKTHROUGH DEVICES PROGRAM, GUIDANCE FOR INDUSTRY AND FOOD AND DRUG ADMINISTRATION STAFF (Sept. 15, 2023).

128 technologies in total have received "Breakthrough Device Designation" and subsequently garnered FDA marketing authorization in the nearly ten years since the inception of the program.[14]

8.      Ceribell's patent-protected breakthroughs were recognized and subsequently pirated, without license or permission, by Natus.  Natus' latest act of infringement is the "BrainWatch" system—a shameless copy of Ceribell's patented inventions that Natus rushed to market in May 2025 without testing it in clinical trials (hereafter, "the Accused Products").  Natus even admitted to the FDA that its copycat device has only "minor" differences from Ceribell's original, and Natus relies exclusively on Ceribell's products as "predicate devices" in these regulatory filings.[15]  Having failed to develop competing technology through legitimate means, Natus chose the path of patent infringement.  Ceribell brings this case to put a stop to Defendants' unlawful acts.

## PARTIES

9.      Ceribell, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 360 N Pastoria Ave., Sunnyvale, CA 94085.

10.     On information and belief, Defendant Natus Medical Incorporated ("Natus Medical") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 3150 Pleasant View Rd., Middleton, WI 53562.

11.     On information and belief, Defendant Excel-Tech Ltd. ("XLTEK") is a corporation organized and existing under the laws of Canada, having a principal place of business at 2568

---

[14]  *Breakthrough Devices Program*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medical-devices/how-study-and-market-your-device/breakthrough-devices-program#authorizations  (last visited June 27, 2025).

[15]  Letter from U.S. Food & Drug Admin. to Prithful Bom, Natus Medical Incorporated DBA Excel-Tech     Ltd.     (XLTEK)     (Nov.     19,     2024),     available     at https://www.accessdata.fda.gov/cdrh_docs/pdf24/K242930.pdf

Bristol Circle, Oakville, Ontario, L6H 5S1, Canada. On information and belief, XLTEK was acquired by Natus Medical in 2007 and operates as a division, subsidiary of, or d/b/a name for Natus Medical.

12.    On information and belief, Natus Neurology Incorporated ("Natus Neuro") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 3150 Pleasant View Rd., Middleton, WI 53562. On information and belief, Natus Neuro operates as a division or subsidiary of Natus Medical.

<u>**JURISDICTION AND VENUE**</u>

13.    This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.

14.    This Court has exclusive subject matter jurisdiction over the matters asserted herein under 28 U.S.C. §§ 1331 and 1338(a).

15.    This Court has personal jurisdiction over Defendant Natus Medical, a Delaware corporation that resides in this District. Upon information and belief, Defendant Natus Medical sells, offers for sale, imports, and/or distributes infringing products in the United States and places them into the stream of commerce of the United States, including within the State of Delaware, including by or on behalf of one or more of Defendants XLTEK and Natus Neuro. In this manner, Defendant Natus Medical has, directly and indirectly, regularly committed and continues to commit acts of patent infringement in this District by, among other things, making, using, selling, offering for sale, and/or importing products and services that infringe the Asserted Patents.

16.    This Court has personal jurisdiction over Defendant XLTEK, which upon information and belief, sells, offers for sale, imports, and/or distributes infringing products in the United States and places them into the stream of commerce of the United States, including within

the State of Delaware, including by or on behalf of one or more of Defendants Natus Medical and Natus Neuro. These acts of infringement have established minimum contacts with this forum such that the exercise of jurisdiction over Defendant XLTEK would not offend traditional notions of fair play and substantial justice. In this manner, Defendant XLTEK has, directly and indirectly, regularly committed and continues to commit acts of patent infringement in this District by, among other things, making, using, selling, offering for sale, and/or importing products and services that infringe the Asserted Patents.

17.    This Court has personal jurisdiction over Defendant Natus Neuro, a Delaware corporation that resides in this District. Upon information and belief, Defendant Natus Neuro sells, offers for sale, imports, and/or distributes infringing products in the United States and places them into the stream of commerce of the United States, including within the State of Delaware, including by or on behalf of one or more of Defendants Natus Medical and XLTEK. In this manner, Defendant Natus Neuro has, directly and indirectly, regularly committed and continues to commit acts of patent infringement in this District by, among other things, making, using, selling, offering for sale, and/or importing products and services that infringe the Asserted Patents.

18.    Under 28 U.S.C. §§ 1391(b) and (c) and 1400(b), venue is proper in this judicial district. Defendant XLTEK is a foreign corporation that may be sued in any judicial district where it is subject to personal jurisdiction. Defendants Natus Medical and Natus Neuro are Delaware corporations and therefore reside in this District. In addition, all Defendants have committed acts of infringement in this District by making, using, selling, offering for sale, and/or importing in this District (and elsewhere) infringing products and services that give rise to this action.

## TECHNOLOGY BACKGROUND

19.    Seizures are sudden, uncontrolled electrical disturbances in the brain that can affect behavior, movements, emotions, and consciousness.   In intensive care settings, over 90% of seizures are non-convulsive, *i.e.*, there are no visible symptoms, and detection is only possible through EEG.[16] Seizures—especially prolonged seizures—in the ICU are considered neurological emergencies, as for every minute these hidden seizures go untreated, brain tissue is at risk of harm. Prolonged non-convulsive seizures can evade diagnosis, extend hospital stays, increase the risk of complications, cause permanent brain damage, and even lead to death.[17]

20.    Guidelines promulgated by the Neurocritical Care Society recommend the initiation of EEG monitoring within 60 minutes of seizure suspicion, especially when non-convulsive seizures are suspected.[18]   However, meeting the "within 60 minutes" guideline was nearly impossible with conventional EEG systems.  Those systems typically required a specially trained technician to carefully apply 20 or more individual electrodes at specific locations on the patient's head: a time-consuming and challenging exercise prone to frequent failure.[19]   In many hospitals, EEG technicians are only onsite during working hours, Monday to Friday, leaving significant gaps for 24/7 coverage.   These challenges have worsened in recent years due to a

---

[16]    J. Claassen et al., *Detection of Electrographic Seizures with Continuous EEG Monitoring in Critically Ill Patients*, 62 NEUROLOGY 1743 (2004).

[17]    O. Mecarelli et al., *EEG Patterns and Epileptic Seizures in Acute Phase Stroke,* 31 CEREBROVASC. DISEASES 191 (2011).

[18]    Gretchen M. Brophy et al., *Guidelines for the Evaluation and Management of Status Epilepticus*, NEUROCRITICAL CARE SOC'Y, Apr. 2012.

[19]    Patrick Ledwidge, et al., *Recommendations for Developing an EEG Laboratory at a Primarily Undergraduate Institution*, J. UNDERGRADUATE NEUROSCIENCE EDUC., Fall 2018.

shortage of EEG technicians and neurologists,[20] making reliable and on-demand EEG monitoring unpredictable and unavailable in all but the most top-tier, well-funded academic medical centers. Multiple studies show that the delay in availability of conventional EEG is regularly hours and often days, leading to suboptimal patient management.[21]



**Fig. 2. Conventional EEG System Being Operated on a Patient**

21.    This gap—between the need for rapid brain monitoring in point-of-care settings such as ICUs, urgent care clinics, and emergency rooms, and the challenge of conventional EEG access in those settings—was a fundamental problem that Ceribell was founded to address. Ceribell was co-founded by Dr. Josef Parvizi, M.D., Ph.D., Chris Chafe, D.M.A, and Jane Chao, Ph.D. They recognized that the EEG monitoring products offered by legacy EEG companies such as Natus were not meeting patients' needs in these medical settings, as they cannot be deployed or interpreted quickly enough. As a physician, Dr. Parvizi saw that he and his colleagues were unable

---

[20]    Timothy M. Dall et al., *Supply and Demand Analysis of the Current and Future US Neurology Workforce*, 81 NEUROLOGY 470 (2013).

[21]    *See, e.g.*, Mariel Kalkach-Aparicio et al., *Seizure Assessment and Forecasting With Efficient Rapid EEG ("SAFER-EEG")*, NEUROLOGY, July 2024; Shaurya Taran et al., *Educational Initiatives and Implementation of Electroencephalography into the Acute Care Environment: A Protocol of a Systematic Review*, SYSTEMATIC REVIEWS, 2020; Norah M.K. Wright et al., *Evaluating the Utility of Rapid Response EEG in Emergency Care*, EMERGENCY MED. J., 2021.

to make appropriate clinical decisions for their patients, who suffered from delayed or suboptimal treatment regimens due to the lack of readily available EEG monitoring.  The three co-founders started Ceribell to solve this problem by developing a rapidly deployable, bedside EEG monitoring tool that eventually became the Ceribell System.

22.    Ceribell's early years were not easy.  The founding team members worked hard to turn their idea into a prototype that became a marketable product.  Ceribell's founders labored tirelessly, including for nearly two years with minimal or no pay, to try to find investors who shared their vision.

23.    Raising capital was particularly challenging for Ceribell.  The lack of historical innovation in the EEG market made it an unfamiliar investment for venture capitalists.  Through their relentless efforts, Ceribell's co-founders were eventually able to raise $1 million in seed funding to develop their vision, and subsequently secured a $9 million investment to build a product ready for commercialization.  In the medical device market, this represented a very modest investment for a new company.  New devices, even from established manufacturers, typically require tens of millions of dollars to bring to market.  During this period, the majority of Ceribell's early employees took significant salary cuts compared to their previous jobs.  They made this sacrifice because they believed in the co-founders' vision of enabling better patient care through rapid bedside EEG.

24.    Building the technology itself was highly challenging.  Other companies, both before and after Ceribell, have tried to make EEG easier and quicker to set up, but none have overcome the core technical barriers.  Examples of previous attempts at point-of-care EEG systems that were not successful include the StatNet EEG electrode headband, developed by BioSignal Group, and the EEG-NOW system, developed by Encephalodynamics.  EEG is a complex and

11

weak signal (~1,000 times weaker than the cardiac electrical signal) and is highly sensitive to noise, motion and interference.  Furthermore, the scalp is often covered with hair and shaped irregularly, making it more difficult to reliably acquire high-quality signals.  This is why, historically, a well-trained EEG technician is required to take special care in setting up an EEG, typically 20-30 minutes per EEG.  Developing a device that allowed any nurse or non-EEG specialist to set up an EEG much more quickly was unthinkable, before Ceribell.

25.     Despite the challenges, Ceribell has successfully developed the technology that allows non-specialist setup of EEG in 5 to 10 minutes, greatly expanding the number of patients who benefit from EEG monitoring and creating a brand-new market that had been ignored for decades by EEG incumbents like Natus: the market for point-of-care EEG monitoring.

26.     The Ceribell System was specifically designed to address the limitations of conventional EEG recognized by Ceribell's co-founders, and to improve clinical outcomes of critically ill patients at high risk of otherwise undetectable seizures.[22]  The Ceribell System represents a first-of-its-kind technology that integrates reliable highly portable hardware with proprietary AI-powered algorithms to deliver precise seizure detection and assessment in minutes rather than hours or days.[23]

27.     The Ceribell System's hardware consists of a novel and highly effective disposable, flexible headband embedded with 10 EEG electrodes and a pocket-sized, battery-operated recording and amplifying device that captures and wirelessly transmits EEG data to a secure cloud portal.  Once recorded, EEG signals are streamed live to a web-based portal, enabling caretakers

---

[22]  **Exhibit 14** at 1, 2, 89, 98, Ceribell S-1 Filing, Form S-1/A (2024).

[23]  *Id.*

to remotely monitor brain activity from any internet-connected device and eliminating delays tied to on-site technologist support and neurologist availability for interpretation.[24]

28.    The Ceribell System is intuitive, easy to use, and allows frontline clinicians and nurses (not just those with specialized EEG training) to initiate EEG monitoring and receive support within minutes, dramatically accelerating diagnosis and treatment compared to conventional EEG workflows.  Ceribell's Clarity™ AI-powered algorithms aid in the rapid diagnosis and measurement of seizures in critical care settings by assessing seizure burden (*i.e.*, the amount of seizure activity within a set time window) from continuously monitored EEG data outputs.

29.    In addition to offering a portable and easily deployable EEG solution, the Ceribell System delivers a highly accurate, diagnostic-quality EEG signal using just an 8-channel headband.[25]  By contrast, conventional EEG systems typically require 19 or even 32 channels, comprising 20 and 33 electrodes, respectively.[26]  The high-quality EEG data output of the Ceribell System—the product of rigorous clinical testing that upended traditional expectations about EEG monitoring—is readily comparable to more complex measurement systems.  Together with its streamlined setup and rapid implementation, the Ceribell System provides an efficient and accessible solution for critical care environments, enabling timely neurological assessment without

---

[24]  *Id.*

[25]  M. Brandon Westover et al., *Diagnostic Value of Electroencephalography with Ten Electrodes in Critically Ill Patients*, 33 NEUROCRITICAL CARE 479 (2020).

[26]  *Id.*; *see also* Kapil Gururangan et al., *Diagnostic Utility of Eight-Channel EEG for Detecting Generalized or Hemispheric Seizures and Rhythmic Periodic Patterns*, 3 CLINICAL NEUROPHYSIOLOGY PRACTICE 65 (2018).

the delays associated with conventional EEG systems.[27]  Front and center to the benefits of the Ceribell System is its novel headband design, which streamlines the EEG setup process for rapid deployment in acute care settings.  The headband's electrode assemblies are engineered to ensure precise placement, efficient gel delivery to the skin surface, and optimal signal acquisition, reducing setup errors and improving data reliability.  This intuitive design not only enhances ease of use for non-specialists, it also maximizes accuracy in seizure detection.[28]

30.    The Ceribell System stands out from conventional EEG systems not only due to its streamlined setup, but also its highly accurate data output.  The Ceribell System, including its algorithms, has been proven to reliably detect seizures in critically ill patients.[29]

31.    Through Ceribell's significant clinical testing investments and partnership with medical institutions, Ceribell supported rigorous clinical testing and validation studies, confirming for the healthcare community that Ceribell's EEG monitoring solution performed at least as well as, if not better than, conventional EEG in hospital ICUs.  The Ceribell System has been evaluated in numerous studies at leading medical institutions, resulting in a large number of published peer-reviewed articles documenting its effectiveness and accuracy in EEG monitoring and seizure detection.  A detailed overview of at least 10 such studies can be found on Ceribell's website: https://ceribell.com/evidence/clinical-studies/.

---

[27]  *Id.*

[28]  Marian P. LaMonte, *Ceribell EEG Shortens Seizure Diagnosis and Workforce Time and is Useful for COVID Isolation*, 2021 EPILEPSIA OPEN 331.

[29]  *See, e.g.*, Baharan Kamousi et al., *Comparing the Quality of Signals Recorded with a Rapid Response EEG and Conventional Clinical EEG Systems*, 4 CLINICAL NEUROPHYSIOLOGY PRACTICE 69 (2019); Paul M. Vespa et al., *Evaluating the Clinical Impact of Rapid Response Electroencephalography: The DECIDE Multicenter Prospective Observational Clinical Study*, CRITICAL CARE MED., Sept. 2020; Zubeda B. Sheikh et al., *Accuracy of a Rapid Response EEG's Automated Seizure-Burden Estimator*, NEUROLOGY, Jan. 2025.

32.    For instance, the SAFER-EEG Trial (Seizure Assessment and Forecasting With Efficient Rapid-EEG) was a retrospective, multi-center study, involving over 1,000 patients, that compared the Ceribell System with conventional EEG in acutely ill patients at risk for seizures.[30] The SAFER-EEG trial demonstrated that the Ceribell System performed at least as well as conventional EEG at forecasting in-hospital seizure risk, significantly reduced the time to EEG acquisition (a median time of 5.9 hours compared to 25.3 hours with conventional EEG), and led to better neurological outcomes for 18% more patients compared to conventional EEG.[31] Indeed, the published, peer-reviewed results of the multicenter study demonstrated that the Ceribell System "outperforms conventional EEG across various outcomes."[32]

33.    As another example, the DECIDE Study (Diagnostic Evaluation of Ceribell Rapid Response EEG) was a prospective, multicenter observational study conducted across five academic hospitals in the United States.[33] The DECIDE Study demonstrated that the Ceribell System improved diagnostic accuracy, increasing non-specialist physicians' sensitivity for seizure detection from 77.8% with clinical judgment alone to 100% when using the Ceribell System, and specificity from 63.9% to 89% with the addition of Ceribell EEG data.[34] These findings indicate

---

[30]  Mariel Kalkach-Aparicio et al., *Seizure Assessment and Forecasting With Efficient Rapid EEG ("SAFER-EEG")*, NEUROLOGY, July 2024

[31]  *Id.*

[32]  Marco Meglio, *Ceribell Point-of-Care EEG Platform Outperforms Conventional EEG Across Various Outcomes in Multicenter Study*, NEUROLOGYLIVE (Aug. 10, 2024), https://www.neurologylive.com/view/ceribell-eeg-platform-outperforms-conventional-eeg-across-various-outcomes

[33]    Paul M. Vespa et al., *Evaluating the Clinical Impact of Rapid Response Electroencephalography: The DECIDE Multicenter Prospective Observational Clinical Study*, CRITICAL CARE MED., Sept. 2020.

[34]  *Id.*

that the Ceribell System enhances both the ability to correctly identify patients experiencing seizures ("sensitivity") and the ability to correctly identify those not experiencing seizures ("specificity").  The study also showed that the Ceribell System enhanced physician confidence in diagnostic and treatment decisions and that it significantly reduced the time to EEG acquisition compared to conventional EEG.[35]

34.    These advancements in EEG monitoring technology, made possible by the groundbreaking Ceribell System, are driven by innovations protected under Ceribell's United States patent portfolio.  As a result of Ceribell's extensive investments in research and development and its commitment to intellectual property, Ceribell possesses a substantial patent portfolio.  Over the years, the United States Patent and Trademark Office ("USPTO") has granted Ceribell a number of United States patents covering its inventions, including but not limited to those identified as Asserted Patents.

35.    The demonstrable benefits of the Ceribell System have been touted by many neurologists and other medical practitioners.  Testimonials available on Ceribell's website describe the Ceribell System as "ma[king] a huge difference as far as timing and being able to rapidly assess and treat appropriately,"[36] with one neurologist describing Ceribell's EEG technology as "chang[ing] our culture as far as how we manage patients with seizures, how we manage patients neurologically, and doing it in a way that doesn't compromise patient care."[37]

---

[35]  *Id*.

[36]  CERIBELL, INC., http://www.ceribell.com (last visited July 2, 2025) (Testimonial by neurologist Margo Block, DO).

[37]  CERIBELL, INC., http://www.ceribell.com (last visited July 2, 2025) (Testimonial by neurologist Parshaw Dorriz, MD0.

36.    Ceribell and its groundbreaking Ceribell System have been recognized by several prestigious industry awards[38] and the FDA itself,[39] further validating the innovative and impactful nature of the technology.

37.    In short, the Ceribell System has demonstrated great success in the field of neurological monitoring, the technology is improving patient outcomes, and Natus has taken notice of these successes after many years of failing to innovate on its own.  The Ceribell System truly represents a revolution in point-of-care brain monitoring.  The visionary efforts of Ceribell's co-founders and the sacrifices of Ceribell's early employees have now come to fruition, as Ceribell has built a business that is widely respected by healthcare providers, hospitals, and the investment community as truly innovative and renowned for making a difference in patients' neurological care and health outcomes.

## NATUS RELIES ON INFRINGEMENT TO COMPETE

38.    Natus is a medical equipment manufacturer founded in 1989.  In 2022, after being publicly traded for more than two decades with its stock price stagnating for years, Natus was

---

[38] At the 2019 Medical Design Excellence Awards, Ceribell received Gold in the "Testing and Diagnostic Products and Systems" category, Silver in the "NonSurgical Hospital Supplies and Equipment" category, and was awarded overall Best in Show.  Advanced Manufacturing New York, *Winners of the 2019 Medical Design Excellence Awards (MDEAs) Announced at MD&M East*, GLOBENEWSWIRE (June 11, 2019, 6:15 PM), https://www.globenewswire.com/news-release/2019/06/11/1867283/0/en/Winners-of-the-2019-Medical-Design-Excellence-Awards-MDEAs-Announced-at-MD-M-East.html.  In 2018, Fierce MedTech Fierce 15 awards recognized Ceribell as one of the top 15 emerging medical device companies.  Conor Hale, *FierceMedTech's 2018 Fierce 15*, FIERCE BIOTECH (Feb. 11, 2019, 3:00 AM), https://www.fiercebiotech.com/special-report/fiercemedtech-s-2018-fierce-15.  Ceribell was also recently recognized in 2023 by Fast Company as one of the top 10 most innovative medical device companies.  Ceribell, Inc., *Ceribell Named to Fast Company's 2023 List of the World's Most Innovative Companies*, PR NEWSWIRE (Mar. 2, 2023), https://www.prnewswire.com/news-releases/ceribell-named-to-fast-companys-2023-list-of-the-worlds-most-innovative-companies-301760414.html.

[39] *See supra* Introduction.

acquired by private equity firm, ArchiMed.[40]  As part of the acquisition, Natus Medical was split into two companies: Natus Sensory and Natus Neuro.

39.    Despite tracing its history in the EEG domain back to 1935 through the acquisition of Grass Technologies—one of the earliest EEG companies[41]—Natus failed to meaningfully grow the market beyond approximately $350 million.[42]  It never meaningfully innovated on the legacy EEG technology, either because it lacked the vision to recognize the significant shortcomings of its products in serving ICU and ED patients, or because it had no incentive to disrupt what had been a consistent and status quo-driven business.  Natus offerings remained limited to conventional, legacy EEG solutions of the type that rely on 20 or more electrodes around the head applied by a trained specialist.  Until BrainWatch, Natus had never marketed a wearable, point-of-care EEG system.

40.    Although Natus had the resources and decades of experience to develop point-of-care EEG products, it was Ceribell that revolutionized the industry through its innovative technologies, proving the existence of an estimated $2 billion opportunity[43] in the United States alone that Natus now seeks to exploit by piggybacking on Ceribell's efforts.  On information and

---

[40]  Andrea Park, *Natus Medical to Go Private in $1.2B Private Equity Acquisition Deal*, FIERCE BIOTECH (Apr. 18, 2022, 10:15 AM), https://www.fiercebiotech.com/medtech/natus-medical-go-private-12b-private-equity-acquisition-deal.

[41]  *Natus to Acquire Grass Technologies Product Group from Astro-Med*, ASTRONOVA (Jan. 7, 2013), https://www.astronovainc.com/natus-to-acquire-grass-technologies-product-group-from-astro-med/.

[42]  *U.S. Electroencephalography Devices Market Size, Share & Trends Analysis Report By Product (32-Channel, Multichannel), By Type (Portable Device, Standalone Device), By Application, By End-use, And Segment Forecasts, 2024 – 2030*, GRAND VIEW RSCH., https://www.grandviewresearch.com/industry-analysis/us-electroencephalography-devices-market-report (last visited June 27, 2025).

[43]    Ceribell, Inc., *Corporate Presentation* at 24 (May 2025), available at https://investors.ceribell.com/static-files/93414aaf-bbee-4883-8ab3-be6a13d72301.

belief, rather than undertake the substantial investment of time and resources required to independently develop and validate its own system, Natus willfully appropriated and copied Ceribell's proprietary technology after observing the Ceribell System's unprecedented commercial success.  This copying led to infringement of Ceribell's Asserted Patents.

41.    This is not Natus' first infringement rodeo.  Natus is an adjudicated copyist in the industry.  In 2015, Natus was sued in the District of Delaware by Nox Medical Ehf. ("Nox Medical") for patent infringement due to its manufacturing, sale, and exportation of XactTrace, a pre-sized single-use biometric belt incorporating a patented connector for use in sleep diagnostic technologies.[44]  During the case, discovery revealed that Natus had deliberately copied Nox Medical's commercial product while the patent application was pending, and continued to do so after the patent issued.  The Court found Natus "deliberately copied the ideas and design of Plaintiff and continued to produce copied belts after receiving notice of the [] patent's existence."[45]

42.    The Nox Medical case was tried to a jury in April 2018.  The jury ultimately found Natus to have willfully infringed Nox Medical's patent.[46]  The Court subsequently issued a permanent injunction and awarded damages against Natus for its infringement.[47]

---

[44]    Complaint for Patent Infringement at 2-3, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. Aug. 17, 2015), D.I. 1.

[45]    Memorandum Opinion at 7, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. Aug. 27, 2018), D.I. 329.

[46]    Final Jury Instructions at 30, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. May 7, 2018), D.I. 259; Verdict Form at 2, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. May 7, 2018), D.I. 262.

[47]    Permanent Injunction, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. June 5, 2018), D.I. 285; Final Judgment, *Nox Med. Ehf v. Natus Neurology Inc.*, No. 1:15-cv-00709-RGA (D. Del. Sept. 11, 2018), D.I. 335.

43.     On information and belief, through the success and accolades achieved by Ceribell after launching the Ceribell System in 2018, Natus and its new owner, ArchiMed, recognized a growing market opportunity for point-of-care EEG technology.  With its explosive growth and strong investor appeal, Ceribell represented the ideal success story that private equity firms like ArchiMed aim to replicate.  Natus thus set out to copy the Ceribell System and cash in on the new market that Ceribell had worked so hard to create.  Natus did so by copying the product's appearance, its disposable single-use elastic headband design, its electrode configuration and count, its sizing options, and its usage guidelines.  Natus also co-opted terminology Ceribell had popularized in the industry, including "point-of-care EEG" and its advantages "when every minute matters" [Natus: "when time matters"].  Most importantly, as demonstrated in the infringement analysis below and the accompanying infringement charts, Natus copied numerous claimed features of Ceribell's patents to launch an infringing product that unfairly competes against Ceribell in the point-of-care EEG market that Ceribell created.

44.     Instead of undertaking the extensive efforts required to identify unmet clinical needs, secure investments, innovate breakthrough technologies, develop and train sophisticated AI algorithms, and educate physicians about the clinical benefits of a brand-new approach to an old problem, Natus simply appropriated the fruits of Ceribell's labor.

45.     Aiming to capitalize on Ceribell's success, Natus publicized submission of its copycat point-of-care EEG device for FDA clearance on the eve of Ceribell's IPO.[48]  On May 20,

---

[48]     Natus Medical Inc., *Natus Seeks FDA 510(k) Clearance for Its Highly Anticipated Point-of-Care EEG Solution*, PR NEWSWIRE (Oct. 10, 2024, 5:05 PM), https://www.prnewswire.com/news-releases/natus-seeks-fda-510k-clearance-for-its-highly-anticipated-point-of-care-eeg-solution-302273441.html; *CeriBell, Inc. Announces Closing of Upsized Initial Public Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares*, NASDAQ (Oct 15, 2024, 5:00 PM),     https://www.nasdaq.com/press-release/ceribell-inc-announces-closing-upsized-initial-public-offering-and-full-exercise.

2025, Natus announced the commercial launch of its BrainWatch system.[49]  As described, the BrainWatch Point-of-Care EEG System bears a striking resemblance to Ceribell's product in its appearance, features, and functionality, positioning it as an alternative to the Ceribell System.

46.    Natus' website describes the BrainWatch system as "a wireless, wearable point-of-care EEG system."[50]  It goes on to state: "Designed for ease of use, BrainWatch Point-of-Care EEG enables quick setup by any ED or ICU clinician within minutes. Bedside alerts for suspected continuous seizures empower care teams to make rapid triaging decisions and collaborate with neuro teams effectively."[51]  Natus' website makes available point-of-care EEG documentation that relies on Ceribell data to validate point-of-care EEG use.[52]

47.    On information and belief, Natus has intentionally copied Ceribell's wearable EEG System and is using Ceribell's patented technology, as discussed in further detail below and illustrated by the infringement charts attached hereto.

48.    On information and belief, Natus was aware of Ceribell's technology and products during its development of the Accused Products.  In November 2024, Natus filed and received 510(k) clearance from the FDA for its BrainWatch technology, expressly naming both the Ceribell

---

[49]    Natus Medical Inc., *Natus Announces Entry into Point-of-Care EEG with Launch of BrainWatch*, PR Newswire (May 20, 2025), https://www.prnewswire.com/news-releases/natus-announces-entry-into-point-of-care-eeg-with-launch-of-brainwatch-302460438.html.

[50]    *BrainWatch Point-of-Care EEG*, NATUS, https://natus.com/neuro/brainwatch/?utm_campaign=8237573-Neuro%20-%20BrainWatch%20POC%20EEG&utm_content=333248891&utm_medium=social&utm_source=linkedin&hss_channel=lcp-863741#n6514d9fe090dcAsdasdfsdkjlfs (last visited May 23, 2025).

[51]    *Id.*

[52]    Natus Medical Inc., *Building a Bridge Between Neurology and Point-of-Care EEG*, Natus White Paper No. 048302 RevA (2025), available at Natus.com.

Pocket EEG Device (K170363) and Ceribell Instant EEG Headband (K210805) as predicate devices.[53]

49.     Appended to the 510(k) clearance summary on pages 10-15 is a table, which Natus submitted to the FDA with its filing, comparing the Accused Products to Ceribell. In Natus' own words, any differences between these devices "are minor and do not impact the overall performance or safety[.]"[54]

---

[53]   Letter from U.S. Food & Drug Admin. to Prithful Bom, Natus Medical Incorporated DBA Excel-Tech Ltd. (XLTEK) (Nov. 19, 2024), available at https://www.accessdata.fda.gov/cdrh_docs/pdf24/K242930.pdf.

[54]   *Id*. at 16.

| Feature | Subject Device Natus BrainWatch Sytem | Predicate 1 Ceribell Pocket EEG Device, K170363 | Predicate 2 Ceribell Instant EEG HeadbandK210805 | Comments |
|---|---|---|---|---|
| Where used | Professional healthcare facility. | Professional healthcare facility | Professional healthcare facility, in the home or clinical research | Same as predicate |
| Sterility | Non-Sterile | Non-Sterile | Non-Sterile | Same as predicate |
| A/D Conversion | 24-Bit Delta-Sigma | 24-Bit Delta-Sigma | N/A | Same as predicate |
| Sampling Rate | 250 Hz | 250 Hz | N/A | Same as predicate |
| Battery charging power adapter | 100-240V AC power adapter | 100-240V AC power adapter | N/A | Same as predicate |
| Bedside Unit-PC Interface | Bedside unit to computer using WiFi | Bedside unit to computer using WiFi or Micro-USB cable | N/A | Similar to predicate but equivalent in safety and effectiveness. Predicate device has a Micro-USB cable as an alternate option. |
| WiFi frequency/standard | 2.4 GHz IEEE 802.11 b/g/n | 2.4 GHz IEEE 802.11 b/g/n | N/A | Same as predicate |
| Type of Applied Part | BF | BF | N/A | Same as predicate |
| Type of Patient Contact | Contacts patient scalp | N/A | Contacts patient scalp | Same as predicate |
| Type of Use | Single use, non-sterile, disposable | N/A | Single use, non-sterile, disposable | Same as predicate |
| Available Sizes | Small 45-51 cm Medium 50-56 cm Large 55-62 cm | N/A | Small 45-51 cm Medium 50-56 cm Large 55-62 cm | Same as predicate |
| Number of Electrodes | 12 (Locations: Fp1, F7, T3,T5, O1, Fp2, F8, T4, T6, O2, Reference, Ground) | 10 (Locations: Fp1, F7, T3, T5, O1, Fp2, F8, T4, T6, O2) | 10 (Locations: Fp1, F7, T3, T5, O1, Fp2, F8, T4, T6, O2) | Similar to predicate but equivalent in safety and effectiveness. |
| Type of Electrodes | Passive Ag/AgCl | N/A | Passive Ag/AgCl | Same as predicate |
| Conductive Electrolyte Gel | Conductive electrolyte gel is included in sealed gel pods integrated into each electrode assembly. User is also able to add additional electrolyte gel when needed using another gel pod. | N/A | Conductive electrolyte gel is included in sealed gel packets integrated into each electrode assembly. User is also able to add additional electrolyte gel when needed using a syringe. | Similar to predicate but equivalent in safety and effectiveness. To add additional gel to the subject device, a new, fully filled gel pod can be replaced. For the predicate device, additional gel is applied using a syringe. |

**Fig. 3. BrainWatch 510(k) at 10-15 (excerpted) (highlighting added)**

50.    As that table shows, the Accused Products identically implement 10 recording

electrodes, of the same type, placed in the same locations as on the Ceribell System headband.[55]

---

[55]    *Id.* at 13-14.  The Accused Products contain a "reference" electrode and a "ground" electrode
not present on the Ceribell System.  However, and as noted in the BrainWatch 510(k), the balance

The Accused Products also offer headbands in the same head size range as the Ceribell System headbands: 45-62 cm.[56]  And the Accused Products include "sealed gel pods integrated into each electrode assembly" to apply electrolyte gel to the patient's skin, just like in the Ceribell System.[57]

51.    Natus has been directly targeting current Ceribell customers with its copycat system, and encouraging its adoption by providing informational materials that rely on Ceribell's products and contributions.[58]  For example, a white paper entitled "Building a Bridge Between Neurology and Point-of-Care EEG" relies on Ceribell-funded studies showing the need for point-of-care EEG devices and the effects of their implementation in hospitals.[59]  Further, the same paper references a study by one of the inventors of Ceribell's System, demonstrating the rarity of seizures in brain regions not covered by its headband.[60]  Tellingly, none of these Natus materials appears to rely on any studies performed by Natus itself.  On information and belief, there are no

---

of 10 recording electrodes on the Accused Products—Locations: Fp1, F7, T3,T5, O1, Fp2, F8, T4, T6, and O2—are identical to the 10 recording electrode locations in the Ceribell System.

[56]  *Id.* at 13.

[57]  *Id.* at 14.

[58]              *BrainWatch    Point-of-Care    EEG*,    NATUS, https://natus.com/neuro/brainwatch/?utm_campaign=8237573-Neuro%20-%20BrainWatch%20POC%20EEG&utm_content=333248891&utm_medium=social&utm_source=linkedin&hss_channel=lcp-863741#n6514d9fe090dcAsdasdfsdkjlfs (last visited May 23, 2025); *How Point-of-Care EEG Helps Overcome Many Challenges of Acute Neurology Care*, NATUS, https://natus.com/insights/how-point-of-care-eeg-helps-overcome-challenges-of-acute-neurology-care/ (last visited May 23, 2025); *6 Reasons Emergency Departments Should Consider Point-of-Care EEG*, NATUS, https://natus.com/insights/6-reasons-emergency-departments-should-consider-point-of-care-eeg/ (last visited May 23, 2025).

[59]  Natus Medical Inc., *Building a Bridge Between Neurology and Point-of-Care EEG*, Natus White Paper No. 048302 RevA (2025), available at Natus.com.

[60]  *Id.*

publications reflecting such Natus-supported studies.[61]  Natus instead is brazenly free-riding on Ceribell's hard work in creating the point-of-care EEG market.

52.    This action seeks to prevent Natus' continued misappropriation and use of Ceribell's patented innovations and to compensate Ceribell for Natus' repeated acts of infringement.  Specifically, Natus has infringed, continues to infringe, contributes to the infringement of, and induces the infringement by others, of each of the Asserted Patents—the '0670 patent, the '679 patent, the '769 patent, the '4670 patent, the '826 patent, and the '434 patent—at least by making using, selling, offering for sale, and/or importing into the United States wearable EEG devices and systems that infringe one or more claims of each of the Asserted Patents.

53.    The Accused Products include, but are not limited to, the Natus BrainWatch Point-of-Care EEG System and its components, as identified and described in greater detail in Counts I-VI below, and in the exemplary infringement claim charts (**Exhibits 7-12**) appended hereto.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,820,670

54.    Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

55.    The '0670 patent, entitled "Methods and Apparatus for Electrode Placement and Tracking," was duly and legally issued by the U.S. Patent and Trademark Office on November 21, 2017.  The '0670 patent is generally directed to electrode assemblies for EEG measurement purposes comprising tubular members with distribution channels for conductive fluid or gel flow. The named inventors on the '0670 patent are Josef Parvizi, Xingjuan (Jane) Chao, Bradley G. Bachelder, Raymond Woo, Mathew A. Herron, Vahid Saadat, Alexander M. Grant, and Jianchun

---

[61] *Supra*, note 58.

Yi.  Ceribell is the original and current owner by assignment of all right, title, and interest in the '0670 patent.  A true and correct copy of the '0670 patent is attached hereto as **Exhibit 1**.

56.    On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '0670 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product. The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

57.    Attached hereto as **Exhibit 7**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claim 1 of the '0670 patent.

58.    By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '0670 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '0670 patent.  Thus, based on this disclosure, Natus has knowledge of the '0670 patent and that its activities infringe the '0670 patent.  Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '0670 patent at least because Natus has known that it is infringing the '0670 patent.

59.    The Accused Product meets all the limitations of at least claim 1 of the '0670 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents.  Ceribell has complied with the marking obligations of 35 U.S.C. § 287.  Ceribell has provided virtual marking through the www.ceribell.com/patents website, which lists the '0670 patent.

60.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claim 1 of the '0670 patent by others.

61.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '0670 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '0670 patent at least by providing instructions and informing the customers how to use the Accused Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website.  *See, e.g.*, **s**.

62.    On information and belief, Natus contributes to infringement of the '0670 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '0670 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '0670 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

63.    On information and belief, Natus had knowledge of or was willfully blind to the '0670 patent and that its actions constitute infringement of the '0670 patent.  Natus has knowledge of the '0670 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

64.    Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

65.    Unless and until Natus is enjoined from further infringement of the '0670 patent, Ceribell will be irreparably harmed.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 12,150,769

66.    Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

67.    The '769 patent, entitled "Methods and Apparatus for Electrode Placement and Tracking," was duly and legally issued by the U.S. Patent and Trademark Office on November 26, 2024.  The '769 patent is generally directed to a method of measuring electrical signals from a subject, which may be used for EEG measurement purposes.  The named inventors on the '769 patent are Josef Parvizi, Xingjuan (Jane) Chao, Bradley G. Bachelder, Raymond Woo, Mathew A. Herron, Vahid Saadat, Alexander M. Grant, and Jianchun Yi.  Ceribell is the original and current owner by assignment of all right, title, and interest in the '769 patent.  A true and correct copy of the '769 patent is attached hereto as **Exhibit 2**.

68.    On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '769 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product.  The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

69.     Attached hereto as **Exhibit 8**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claim 1 of the '769 patent.

70.     By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '769 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '769 patent.  Thus, based on this disclosure, Natus has knowledge of the '769 patent and that its activities infringe the '769 patent.  Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '769 patent at least because Natus has known that it is infringing the '769 patent.

71.     The Accused Product meets all the limitations of at least claim 1 of the '769 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents.

72.     On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claim 1 of the '769 patent by others.

73.     On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '769 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '769 patent at least by providing instructions and informing the customers how to use the Accused Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website.  *See, e.g.*, **Exhibit 13**.

74.     On information and belief, Natus contributes to infringement of the '769 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '769 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '769 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

75.     On information and belief, Natus had knowledge of or was willfully blind to the '769 patent and that its actions constitute infringement of the '769 patent. Natus has knowledge of the '769 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

76.     Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

77.     Unless and until Natus is enjoined from further infringement of the '769 patent, Ceribell will be irreparably harmed.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,324,670

78.     Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     The '4670 patent, entitled "Methods and Apparatus for Electrode Placement and Tracking," was duly and legally issued by the U.S. Patent and Trademark Office on June 10, 2025. The '4670 patent is generally directed to electrode assemblies that may be used for EEG measurement purposes, an electrode carrier system comprising such electrode assemblies, and method for measuring EEG signals using such electrode assemblies. The named inventors on the

'4670 patent are Josef Parvizi, Xingjuan (Jane) Chao, Bradley G. Bachelder, Raymond Woo, Mathew A. Herron, Vahid Saadat, Alexander M. Grant, and Jianchun Yi.  Ceribell is the original and current owner by assignment of all right, title, and interest in the '4670 patent.  A true and correct copy of the '4670 patent is attached hereto as **Exhibit 3**.

80.     On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '4670 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product. The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

81.     Attached hereto as **Exhibit 9**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claim 1 of the '4670 patent.

82.     By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '4670 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '4670 patent.  Thus, based on this disclosure, Natus has knowledge of the '4670 patent and that its activities infringe the '4670 patent.  Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '4670 patent at least because Natus has known that it is infringing the '4670 patent.

83.     The Accused Product meets all the limitations of at least claim 1 of the '4670 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents.  Ceribell has complied with the marking obligations of 35 U.S.C. § 287.  Ceribell has provided virtual marking through the www.ceribell.com/patents website, which lists the '4670 patent.

84.     On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claim 1 of the '4670 patent by others.

85.     On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '4670 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '4670 patent at least by providing instructions and informing the customers how to use the Accused Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website.  *See, e.g.*, **Exhibit 13**.

86.     On information and belief, Natus contributes to infringement of the '4670 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '4670 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '0670 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

87.     On information and belief, Natus had knowledge of or was willfully blind to the '4670 patent and that its actions constitute infringement of the '4670 patent.  Natus has knowledge of the '4670 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

88.     Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

89.     Unless and until Natus is enjoined from further infringement of the '4670 patent, Ceribell will be irreparably harmed.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 12,336,826

90.     Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

91.     The '826 patent, entitled "Methods and Apparatus for Electrode Placement and Tracking," was duly and legally issued by the U.S. Patent and Trademark Office on June 24, 2025. The '826 patent is generally directed to a headband containing electrode assemblies that may be used in EEG measurement devices.  The named inventors on the '826 patent are Josef Parvizi, Xingjuan (Jane) Chao, Bradley G. Bachelder, Raymond Woo, Mathew A. Herron, Vahid Saadat, Alexander M. Grant, and Jianchun Yi.  Ceribell is the original and current owner by assignment of all right, title, and interest in the '826 patent.  A true and correct copy of the '826 patent is attached hereto as **Exhibit 4**.

92.     On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '826 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product.  The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

93.    Attached hereto as **Exhibit 10**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claim 1 of the '826 patent.

94.    By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '826 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '826 patent.  Thus, based on this disclosure, Natus has knowledge of the '826 patent and that its activities infringe the '826 patent.  Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '826 patent at least because Natus has known that it is infringing the '826 patent.

95.    The Accused Product meets all the limitations of at least claim 1 of the '826 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents.  Ceribell has complied with the marking obligations of 35 U.S.C. § 287.  Ceribell has provided virtual marking through the www.ceribell.com/patents website, which lists the '826 patent.

96.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claim 1 of the '826 patent by others.

97.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '826 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '826 patent at least by providing instructions and informing the customers how to use the Accused

Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website. *See, e.g.*, **Exhibit 13**.

98.     On information and belief, Natus contributes to infringement of the '826 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '826 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '826 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

99.     On information and belief, Natus had knowledge of or was willfully blind to the '826 patent and that its actions constitute infringement of the '826 patent.  Natus has knowledge of the '826 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

100.     Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

101.     Unless and until Natus is enjoined from further infringement of the '826 patent, Ceribell will be irreparably harmed.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,433,756

102.     Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

103.     The '756 patent, entitled "Adjustable Geometry Wearable Electrodes," was duly and legally issued by the U.S. Patent and Trademark Office on October 8, 2019.  The '756 patent is generally directed to electrode assemblies that may be used in EEG measurement devices.  The

named inventors on the '756 patent are Bradley G. Bachelder and Xingjuan (Jane) Chao. Ceribell is the original and current owner by assignment of all right, title, and interest in the '756 patent. A true and correct copy of the '756 patent is attached hereto as **Exhibit 5**.

104.    On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '756 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product. The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

105.    Attached hereto as **Exhibit 11**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claims 1 and 22 of the '756 patent.

106.    By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '756 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '756 patent. Thus, based on this disclosure, Natus has knowledge of the '756 patent and that its activities infringe the '756 patent. Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '756 patent at least because Natus has known that it is infringing the '756 patent.

107.    The Accused Product meets all the limitations of at least claim 1 of the '756 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents. Ceribell has complied with the marking obligations of 35 U.S.C. § 287. Ceribell has provided virtual marking through the www.ceribell.com/patents website, which lists the '756 patent.

108.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claims 1 and 22 of the '756 patent by others.

109.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '756 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '756 patent at least by providing instructions and informing the customers how to use the Accused Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website.  *See, e.g.*, **Exhibit 13**.

110.    On information and belief, Natus contributes to infringement of the '756 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '756 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '756 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

111.    On information and belief, Natus had knowledge of or was willfully blind to the '756 patent and that its actions constitute infringement of the '756 patent.  Natus has knowledge of the '756 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

112.    Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

113.    Unless and until Natus is enjoined from further infringement of the '756 patent, Ceribell will be irreparably harmed.

### COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 11,357,434

114.    Ceribell incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

115.    The '434 patent, entitled "Adjustable Geometry Wearable Electrodes," was duly and legally issued by the U.S. Patent and Trademark Office on June 14, 2022.  The '434 patent is generally directed to electrode assemblies that may be used in EEG measurement devices.  The named inventors on the '434 patent are Bradley G. Bachelder and Xingjuan (Jane) Chao.  Ceribell is the original and current owner by assignment of all right, title, and interest in the '434 patent.  A true and correct copy of the '434 patent is attached hereto as **Exhibit 6**.

116.    On information and belief, Natus has directly infringed and continues to infringe one or more claims of the '434 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority or license, for example, the Accused Product.  The Accused Product is a non-limiting example identified based on publicly available information, and Ceribell reserves the right to identify additional infringing activities, products, and services on the basis of information obtained, for example, during discovery.

117.    Attached hereto as **Exhibit 12**, and incorporated herein by reference, is an exemplary claim chart detailing how Natus infringes at least claim 1 of the '434 patent.

118.    By at least the filing of the Complaint, Ceribell has disclosed to Natus the existence of the '434 patent and identified at least some of Natus' and others' activities that infringe at least one claim of the '434 patent.  Thus, based on this disclosure, Natus has knowledge of the '434 patent and that its activities infringe the '434 patent.  Based on Natus' disclosures, Natus has also known or should have known since at least the filing of the Complaint that its customers, distributors, suppliers, and other purchasers of the Accused Product are infringing the '434 patent at least because Natus has known that it is infringing the '434 patent.

119.    The Accused Product meets all the limitations of at least claim 1 of the '434 patent in violation of 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents.  Ceribell has complied with the marking obligations of 35 U.S.C. § 287.  Ceribell has provided virtual marking through the www.ceribell.com/patents website, which lists the '434 patent.

120.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus also actively induces infringement and/or contributes to the infringement of at least claim 1 of the '434 patent by others.

121.    On information and belief, at least as of the date of this Complaint and based on the information set forth herein, Natus actively, knowingly, and intentionally induces infringement of one or more claims of the '434 patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell in the United States the Accused Product.  For example, Natus actively and knowingly induces its customers and end-users, *e.g.*, hospitals, clinicians, and other patient caregivers, to directly infringe in the United States one or more claims of the '434 patent at least by providing instructions and informing the customers how to use the Accused Product in its advertisements, such as in Natus' User Manual concerning the use and operation of the Accused Products, available at its website.  *See, e.g.*, **Exhibit 13**.

122.    On information and belief, Natus contributes to infringement of the '434 patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States a component of the Accused Product, or a material or apparatus for use in practicing a process or method claimed in the '434 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '434 patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

123.    On information and belief, Natus had knowledge of or was willfully blind to the '434 patent and that its actions constitute infringement of the '434 patent. Natus has knowledge of the '434 patent and its actions constitute infringement thereof since at least the filing of this Complaint.

124.    Natus' infringement has damaged and continues to damage Ceribell in an amount yet to be determined, constituting at least a reasonable royalty and/or the lost profits that Ceribell would have made but for Natus' acts of infringement.

125.    Unless and until Natus is enjoined from further infringement of the '434 patent, Ceribell will be irreparably harmed.

## EXCEPTIONAL CASE

126.    On information and belief, this is an exceptional case and Ceribell is entitled to an award of its reasonable attorneys' fees under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Ceribell respectfully requests:

A.      That Judgment be entered that Natus has infringed the '0670, '769, '4670, '826, '756, and '434 patents directly and/or indirectly, by way of inducement or contributory infringement, literally or under the doctrine of equivalents.

B.      That, in accordance with 35 U.S.C. § 283, Natus and all affiliates, employees, agents, officers, directors, attorneys, successors, and assignees, and all those acting on behalf of or in active concert or participation with any of them, be permanently enjoined from (1) infringing the Asserted Patents and (2) making, using, selling, offering for sale and/or importing the Accused Product;

C.      An award of damages sufficient to compensate Ceribell for Natus' infringement under 35 U.S.C. § 284;

D.      Costs and expenses in this action;

E.      An award of pre-judgment and post-judgment interest; and

F.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ceribell respectfully demands a trial by jury on all issues raised by the Complaint.

July 7, 2025

OF COUNSEL:

Kevin P.B. Johnson (*pro hac vice forthcoming*)
Victoria Maroulis (*pro hac vice forthcoming*)
Andrew Bramhall (*pro hac vice forthcoming*)
Margaret Shyr (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Drive
Redwood Shores, California 94065
(650) 801-5000
kevinjohnson@quinnemanuel.com
victoriamaroulis@quinnemanuel.com
andrewbramhall@quinnemanuel.com
margaretshyr@quinnemanuel.com

S. Alex Lasher (*pro hac vice forthcoming*)
Brian L. Saunders (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
(202) 538-8000
alexlasher@quinnemanuel.com
briansaunders@quinnemanuel.com

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
500 Delaware Ave., Suite 220
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiff Ceribell, Inc.*